J-A24024-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.S., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 365 WDA 2020 |

Appeal from the Order Dated February 5, 2020
In the Court of Common Pleas of McKean County Orphans' Court at
No(s): 42-18-0254

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.S., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 366 WDA 2020 |

Appeal from the Order Dated February 5, 2020
In the Court of Common Pleas of McKean County Orphans' Court at
No(s): 42-18-0255

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.:            **FILED DECEMBER 03, 2020**

S.S. ("Father") appeals from the order terminating his parental rights to M.S. and S.S. ("Children"). Father maintains the court erred in finding that the McKean County Children and Youth Services ("CYS") proved by clear and convincing evidence that termination was proper. We affirm.

In December 2016, the trial court granted CYS emergency custody of M.S., born December 2014. S.S. was born in February 2018, and the court

granted CYS's request for emergency custody the month afterward, in March 2018. In October 2018, CYS filed a petition for involuntary termination of Father's parental rights as to both Children.

Father and V.H. ("Mother") were in a volatile and abusive relationship. Police responded to their home on numerous occasions for domestic disputes. N.T., 10/25/19, at 43. One such incident occurred in February 2017, when Mother went to the emergency room for a head injury, and told the emergency room nurse that Father had hit her with a closed fist.

Father and Mother continued to be in a relationship in May 2018, and there continued to be episodes of physical violence, including an incident in March 2018 that resulted in criminal charges against both Mother and Father. N.T, 10/25/19, at 36-43; N.T., 7/26/19, at155.

Father also has a history of abuse against others. Father pled guilty in August 2015 to one count of aggravated assault – victim less than 6 years of age, and received a sentence of six to 23½ months' imprisonment. N.T., 7/26/19, at 140-46. Father also had an indicated finding of abuse of a child. *Id.* at 150. These incidents were 11 to 15 years before the termination hearing. *Id.* at 151.

Father has employment in the oil field industry, and works away from his home in McKean County for multiple weeks each month. N.T., 10/25/19, at 58. When he is working, he is unable to provide care for Children.

Father was inconsistent with visiting with Children. N.T., 7/26/19, at 157. A CYS case aid, Shaina Burgett, testified that she supervised 14 visits,

and that Father did not cancel any visits she supervised, except those that were pre-arranged cancellations due to work. N.T., 11/8/19, at 12. She stated, however, that Father fell asleep with S.S. during two visits. She testified that Father said that if he fell asleep while alone with Children, "[M.S.] was old enough and good enough that he could sit there and keep himself occupied while" Father was sleeping. *Id.* at 13.

Father's goals included obtaining an anger management-focused mental health evaluation and following any recommendations. Father completed the evaluation, but did not follow the recommended treatment plan. N.T., 7/26/19, at 157.

S.S. has had pneumonia five times, and was twice life-flighted to Pittsburgh—in December 2018 and June 2019. N.T., 1/17/20, at 193. In December 2018, Foster Mother called Father to inform him that S.S. was being sent to Pittsburgh because S.S. was in distress. *Id.* at 194. Father responded that he was working near Pittsburgh and would visit the next day. *Id.* at 195. Father arrived the next morning, which was a Friday. *Id.* at 196. S.S. was released from the hospital the following Friday. Father only visited three to four times. *Id.* at 198. During the June 2019 hospitalization, Father was more present. *Id.* at 201-02. Foster Mother further testified that she rode the helicopter with S.S. and that she stepped in when medical providers were unable to place an I.V. in S.S.'s arm, insisting they wait for the helicopter, where more experienced professionals could assist. *Id.* at 249.

An expert in clinical psychology and in bonding assessments, Dr. Peter von Korff, testified that M.S. finds security with Foster Parents. M.S. was "very reluctant" and "slow and hesitant" to approach Father. N.T., 7/26/19, at 48. Dr. von Korff testified that Father has an avoidant approach to attachment. *Id.* at 53. Dr. von Korff testified that S.S. was not comfortable with Father, and was eager to return to Foster Parents. *Id.* at 56-57. He further testified that S.S. "could not have been more relaxed" with Foster Mother. *Id.* at 57. She was engaged, happy, playful, and responsive with Foster Mother. *Id.* Dr. von Korff testified that Children had secure attachments with Foster Parents. *Id.* at 68.

Dr. von Korff testified that, although it might be possible for Mother and Father to form a "primary bond" with Children, he questioned whether that bond would be secure. *Id.* at 77. He testified that although M.S. has a "tentative relationship with both [Parents], that his secure functioning is with the [Foster Parents], and that if severance takes place, that he will be able to rely on that secure functioning." *Id.* at 79.

The trial court terminated Father's rights to Children, finding termination proper under Section 2311(a)(1), (2), (5), and (8), and Section 2311(b).[1] Father filed a timely notice of appeal.

Father raises the following issue: "Whether the trial court abused its discretion in finding that McKean County Children and Youth Services

---

[1] The court also terminated Mother's parental rights. Mother appealed, and we address her appeals at docket 371 WDA 2020 and 372 WDA 2020.

produced clear and convincing evidence to support an involuntary termination, under 23 Pa.C.S.A. Section 2511(a)(1),(a)(2),(a)(5) and (a)(8), of the Appellant's parental rights." Appellant's Br. at 8.

When we review termination of parental rights cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We may reverse a trial court decision "for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *See In re Adoption of K.C.*, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citation and internal quotation marks omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under Section 2511, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*Id.* (citations omitted).

Here, the trial court terminated Father's parental rights pursuant to multiple subsections, including Subsection 2511(a)(1). That subsection provides:

> (a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1). "With respect to any petition filed pursuant to subsection (a)(1) . . . , the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

Subsection 2511(a)(1) requires the moving party to prove by clear and convincing evidence that the subject parent engaged in "conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730

(Pa.Super. 2008). The parental obligation is a "positive duty which requires affirmative performance" and "cannot be met by a merely passive interest in the development of the child." *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003) (quoting *In re Burns*, 379 A.2d 535 (Pa. 1977)). Indeed,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citations omitted).

The trial court concluded CYS presented clear and convincing evidence to establish grounds for termination of parental rights under Section 2511(a)(1). It concluded that Father has not been, and would not be, a placement option for Children due to his "inability to control his anger and past physical assault of Mother and a different child," and his "unavailability, both past and future, to provide care for the children due to his work schedule." Trial Ct. Op. at 3. The court found that Father had failed to perform parental duties during the required six-month period:

> Parents are required to act affirmatively with good faith interest and effort to perform parental duties. . . . Father ha[s] not done that. Since M.S. and [S.S.] were born Father has not been available to provide care. He works in the oil and gas industry and is unavailable for extended periods of

time each month. His worksites are out of the McKean County area, often out of state. When he is working there is no opportunity for him to have contact with the children. Father has a history of violence, including a long history of domestic violence involving Mother and the assault and significant injury to a . . . child. He was ordered to obtain a mental health evaluation, focusing on anger management, and follow his recommended treatment plan. As set forth in the May 9, 2018, Permanency Review Findings in M.S.'s dependency case, Father obtained an evaluation to address his inability to control his anger but, due to his work schedule, did not follow through with his appointments. The court finds that Father has not benefited from treatment; and, he still struggles with controlling his anger and acting out physically. This finding is also supported by the fact that violence between Father and Mother continued after Father's evaluation.

. . .

S.S. has no connection to Parents as she has had limited contact with them; and, [Foster Parents] have provided care and support for her since she was born. There are numerous examples of the care and support [Foster Parents] have provided for both children in this record (and Parents' unavailability). One in particular demonstrates both the commitment [Foster Parents] have to the children and the children's recognition of [Foster Parents] as their parental figures. [Foster Mother] described S.S's first life flighted to Pittsburgh. S.S. was in desperate need of an IV. It was required before she take the flight and needed as she was dehydrated. Parents were not at the hospital and S.S. was in [Foster Mother's] arms. The medical staff attempted, again and again, to stick a needle in her and find one of her tiny veins. S.S. would scream and squirm each time an attempt was made. [Foster Mother], looking out for S.S., said: "enough," telling the medical staff that the team on the helicopter had more experience inserting an IV in a young child and they needed to wait until they arrived. [Foster Mother] was the one there when the flight team arrived, when they grabbed S.S. and held her down while they inserted a needle in her to give her the IV. [Foster Mother] was the one that heard the babies' terrified screams and she was the one that comforted S.S. afterwards.

Regarding the statutory grounds for termination the court finds that CYS has established, by clear and convincing evidence, the following: For over twelve months . . . Father . . ha[s] been unable to provide safe and appropriate care for S.S. and ha[s] failed to make reasonable efforts towards reunification. By [his] actions and [his] inaction [he has] demonstrated a settled purpose to relinquish and/or refuse to perform their parental duties. In addition, the cause of the Parents' inability to take any meaningful action is unlikely, even with the assistance of reasonable services or assistance, to be remedied in the future.

Trial Court Opinion, filed Feb. 5, 2020, at 12-14.

The court did not err as a matter of law or abuse its discretion. Father's conduct prior to the filing of the termination petition, and sustained for at least six months before the filing, revealed a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. Father did not consistently visit with Children, continued to have a violent relationship with Mother, continued to work in a field that required him to be away from the children for multiple weeks every month, and did not follow through with his permanency goals.

Under Section 2511(b), the court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the child's best interest. *See* 23 Pa.C.S.A. § 2511(b). The focus under Section 2511(b) is not on the parent, but on the child. *In re Adoption of R.J.S.*, 901 A.2d 502, 514 (Pa.Super. 2006). This inquiry involves "[i]ntangibles such as love, comfort, security, and stability . . . ." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The trial court "must also discern the nature and status of the parent-child bond, with utmost

attention to the effect on the child of permanently severing that bond." ***Id.*** Importantly, "[t]he mere existence of an emotional bond does not preclude the termination of parental rights." ***In re N.A.M.***, 33 A.3d 95, 103 (Pa.Super. 2011). Rather, the trial court "must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." ***Id.*** (internal quotation marks and citation omitted). Further, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***In re T.S.M.***, 71 A.3d 251, 268 (Pa. 2013).

The trial court concluded termination would best meet S.S. and M.S.'s developmental, physical, and emotional needs and welfare. It found that Children know foster parents are there for them, good or bad, and that M.S. had a negative bond with Father while S.S. had no bond with him:

> M.S. has a negative bond with Parents. He has already, despite what the court or others may say, concluded that [the foster parents] are his parental figures and providers. It would be beneficial to M.S. to sever the negative bond he has with Parents and provide him with assurance that the stability he has experienced with the [foster parents] will be permanent. It would be extremely traumatic to M.S. and S.S. to expand visits with Parents or place them in their care. S.S. has a strong bond with [the foster parents] and no bond with Parents. Therefore, it best fulfills her needs and welfare to terminate parental rights and allow [the foster parents] to adopt [S.S.] and M.S.

1925(a) Op. at 14.

The trial court did not err or abuse its discretion in finding termination would best meet Children's physical, social, and emotional needs and welfare. The testimony at the hearing, including from Dr. von Korff, was that S.S. did not have a bond with Father and M.S. had a negative bond. However, Children had a positive bond with Foster Parents, whom they looked to for love and support. In sum, the record supports the trial court's factual findings, and it did not abuse its discretion in terminating Father's parental rights to Children.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/3/2020